# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| **UNION PACIFIC RAILROAD COMPANY** | **CIVIL ACTION NO. 15-0074** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **TAYLOR TRUCK LINE, INC., ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

**--(consolidated with)--**

| | |
|---|---|
| **R & L BUILDERS SUPPLY, INC., ET AL.** | **CIVIL ACTION NO. 15-2460** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **UNION PACIFIC RAILROAD COMPANY, ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

# RULING

Pending before the Court are motions for partial summary judgment [Doc. Nos. 181, 185, 196 & 208] filed by Prewett Enterprises, Inc. ("Prewett"), Hulcher Services, Inc. ("Hulcher"), College City Leasing, LLC ("College City"), Daniel Shackleford ("Shackleford"), Taylor Logistics, Inc. ("Taylor Logistics), Taylor Truck Line, LLC ("Taylor Truck"), Taylor Consolidated, Inc. ("Taylor Consolidated")[1], and Union Pacific Railroad Co. ("Union Pacific"). Prewett, Hulcher, the Taylor Entities, and Union Pacific move the Court for summary judgment on claims by R & L

---

[1] Collectively, the Court will refer to College City, Shackleford, Taylor Logistics, Taylor Truck, and Taylor Consolidated as "the Taylor Entities."

Taylor Consolidated is not listed as a movant in the motion for partial summary judgment [Doc. No. 196] filed by the other Taylor entities. This appears to be a clerical error. To the extent that claims of business loss are asserted against Taylor Consolidated, those claims are subject to dismissal for the same reasons set forth below, and the Court finds no prejudice to the non-movants by entry of judgment in its favor as well.

Properties of Oak Grove, LLC ("Properties") and R & L Builders Supply, Inc. ("Builders Supply") for "past and future loss of revenues from the anticipated expansion of the business operations [of Builders Supply.]" [Doc. No. 1, ¶ XXXV(f)].

For the following reasons, the motions for partial summary judgment on past and future loss of revenues are GRANTED IN PART and DENIED IN PART.

**I.     FACTS AND PROCEDURAL HISTORY**

On October 5, 2014, a collision occurred in Mer Rouge, Louisiana, when a Union Pacific train collided with a 2013 Kenworth tractor with trailer and dolly (hereinafter "tractor-trailer") which had become lodged on the highway/railway grade crossing when the driver, Daniel Shackleford, attempted to cross.[2]  The tractor-trailer was owned by College City and leased to Taylor Truck.

As a result of the collision, approximately 17 railroad cars and 2 locomotives left the railroad tracks, cargo spilled, and a tank car leaked Argon onto surrounding property.  Properties owns the land located along Church Street in Mer Rouge[3] ("the Church Street Land") where at least some of the cars and other debris came to rest after the collision.  Builders Supply operates a building supply and equipment facility on Andrews Lane in Mer Rouge across the street from the Church Street Land.  At the time of the collision, Builders Supply sold hardware, lumber, and other items necessary

---

[2]The facts surrounding the collision are set forth more fully in the Court's previous rulings in this matter.

[3]The legal description of the land is as follows:

Lots 1 through 12, Block 23 inclusive of the T.H.B. Andrews Addition to Mer Rouge, Louisiana, as per plat thereof recorded in the Office of the Clerk of Court of Morehouse Parish, Louisiana, LESS AND EXCEPT the North 75 feet of Lots 10, 11, and 12, the North 75 feet of the East 5 feet of Lot 9, and the North 30 feet of Lots 7, 8 and 9 of said Block 23.

to build a home. Builders Supply consists of the hardware store and three additional buildings which provide storage for the inventory of doors, sheet rock, treated lumber, and 2 x 4s. Sales at Builders Supply's Andrews Lane location were not affected by the derailment because its sales were significantly higher in April through June 2016 than they were doing the same months in 2014 and 2015.

Approximately one year before the accident, Properties purchased the Church Street Land for the purpose of expanding Builders Supply's business operations. Builders Supply intended to expand the business by constructing a new store location, adding more storage, and offering new items for sale, including septic tanks, culverts, and steps. However, Builders Supply did not have a valid lease of the Church Street Land, no financing had been obtained for the expansion, and no construction had begun.

Randle McLarrin ("McLarrin"), principal of Properties and Builders Supply,[4] offered his opinion that Builders Supply would have an increase in revenues after the expansion based on his "guesswork." [Doc. No. 181-4 Randle McLarrin Depo., p. 160]. McLarrin assumed that business would "double" at the new location and performed some calculations on a scratch pad which he did not retain. [Doc. No. 181-8 Builders Supply Corporate Depo., pp. 42-43]. Builders Supply did not retain an expert to estimate lost revenues in connection with the delayed expansion.

Prior to and at the time of the accident, Builders Supply was storing used cross ties on the Church Street Land. There was also topsoil discovered on the Church Street Land which Properties sold through Builders Supply.

---

[4]McLarrin and his wife, Linda, are members of Properties, a limited liability company organized under Louisiana law. The McLarrins are also officers of Builders Supply, a Louisiana corporation.

On January 14, 2015, Union Pacific brought the instant suit against Shackleford, and the entities that otherwise owned, leased, or had another interest in the tractor-trailer, Taylor Truck, Taylor Logistics, Inc., and College City.[5] On November 4, 2015, a lawsuit filed by Properties and Builders Supply was consolidated with this lawsuit.

On February 27, 2017, the Court issued a Ruling and Judgment [Doc. Nos. 287 & 288], finding that there was no valid lease of the Church Street Land from Properties to Builders Supply and dismissing any claims asserted by Builders Supply for damage to the Church Street Land. The Court allowed Builders Supply to proceed with any claims for damages to cross ties it had stored on the Church Street Land.

On May 9, 2017, the Court issued a Ruling and Judgment [Doc. Nos. 306 & 307] dismissing any claims by Properties and Builders Supply for loss of lease payments relating to the Builders Supply expansion.

In the instant motions, Union Pacific and its contractors, Prewett and Hulcher, as well as the Taylor Entities move for summary judgment on the claims asserted by Properties and Builders Supply for lost profits from the anticipated expansion of Builders Supply to the Church Street Land, as well as lost profits from topsoil sales from the Church Street Land.

The motions have been fully briefed, and the Court is prepared to rule.

---

[5] Union Pacific, Builders Supply, and Properties all later amended to assert claims against the Robert G. Taylor Irrevocable Trust and against Robert G. Taylor, individually and as trustee of the Robert G. Taylor Irrevocable Trust. Those claims have since been dismissed either with or without prejudice and are no longer pending in this Court.

## II. LAW AND ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

### B. Loss of Revenue or Profits from Anticipated Expansion

Although Builders Supply operates a store on Andrews Street, it is not seeking to recover damages for lost profits[6] at that location, other than a loss of sales of topsoil. Instead, Properties and Builders Supply seek to recover damages for the lost profits that could have been realized if the expansion on the Church Street Land had moved forward in the time they anticipated.

The moving parties argue that Properties has no right to make this claim because any lost

---

[6] The terms "loss of revenues" and "lost profits" are used interchangeably. The Court uses lost profits generally because that is the term used in the case law. However, Properties and Builders Supply referred to loss of revenues in their Complaint.

5

profits would belong to Builders Supply. They argue further that Builders Supply cannot prevail on its lost profits claim because this claim is too speculative.

Properties and Builders Supply oppose the motions and argue, first, that there was an enforceable lease in place. Further, they contend that they have provided sufficient evidence to support their claim for lost profits based on McLarrin's testimony, Dr. Randolph Rice's economic model using McLarrin's figures, and the testimony at trial of Builders Supply's accountant, James Michael Gowdy. Finally, they argue that lost profits is no different than an individual's loss of earning capacity, and there is sufficient evidence to support these claims.

The moving parties respond that McLarrin's testimony is insufficient to support Builders Supply's claim because his estimates are based on his own feelings, not credible evidence. They point out that Properties and Builders Supply admit that Dr. Rice's economic projections were never intended to prove that losses would be incurred; instead, that information comes only from McLarrin and the deposition of his accountant which was to be held after briefing on the instant motions was complete.

First, the Court finds that, if the lost profits could be established, such a claim clearly belongs to Builders Supply, which owns and operates the store. Properties, as the owner of the Church Street Land, has no basis for asserting this claim, and the motions for partial summary judgment are GRANTED as to Properties.

On the other hand, Builders Supply could potentially recover lost profits if it can meet the evidentiary standard. Under Louisiana tort law, a plaintiff must prove a claim for lost profits with reasonable certainty. *Borden, Inc. v. Howard Trucking Co., Inc.*, 454 So.2d 1081, 1092 (La. 1983); *see also Wasco, Inc. v. Economic Development Unit, Inc.*, 461 So.2d 1055, 1056-57 (La.App. 4

6

Cir.1984) (stating "the loss of profits is recoverable as an element of damages, if they are proven with reasonable certainty."); *Branton v. Fox*, 2006-1353 (La. App. 1 Cir. 11/21/07) (While lost profits may not always be susceptible of proof to a mathematical certainty, the lost profits must nonetheless be proven to a reasonable certainty). "A claim for lost profits based solely on the testimony of the injured party and unsubstantiated by other evidence does not constitute reasonable certainty." *New Orleans Riverwalk Associates v. Robert P. Guastella Equities, Inc.*, 664 So.2d 151, 157 (La. App. 4th Cir. 1995) as supplemented on denial of reh'g (Dec. 19, 1995), writ granted, 96-0199 (La. 4/8/96), 671 So. 2d 327(citing *Louisiana Joint Underwriters of Audubon Ins. Co. v. Gant*, 439 So.2d 1153, 1157 (La.App. 4 Cir.), *writ denied*, 443 So.2d 589 (La.1983).[7] "Although the absence of ***independent*** corroborative evidence is not always fatal, the lack of even a minimal degree of detail and specificity in the plaintiff's testimony, regarding the issue of lost profits, would preclude recovery of this item of damages." *White Haute, LLC v. Mayo*, 09-955 (La. App. 5 Cir. 3/23/10), 38 So. 3d 944, 953[8] (emphasis added) (citing *Wasco, Inc. v. Economic Development Unit, Inc.*, 461 So.2d 1055, 1056 (La.App. 4 Cir.1984), *writ denied*, 465 So.2d 738 (La. 1985)). Furthermore, a "mere estimate of [plaintiff's] loss will not support a claim for lost profits." *In re Watermeier v. Mansueto*, 562 So.2d 920, 924 (La. App. 5 Cir. 1990); *see also Wasco*, 461 So.2d at 1056-57 (stating "claim for loss of profits will not be supported by mere estimates of loss."). When

---

[7] In *Gant*, the plaintiff sought recovery of lost income from rental units in a building that was destroyed by fire. Although she testified as to the rental rates and related expenses, she provided no records to support her claim. 439 So.2d at 157.

[8] *White Haute* arises out of the breach of a lease contract. The Court is cognizant of the fact that "[t]he allowance of loss of profits as an element of damages is more liberal in tort actions than actions for breach of contract." *Louisiana Farms v. La. Dep't. of Wildlife and Fisheries*, No. 95-845 (La. App. 5th Cir. 10/9/97), 685 So.2d 1086, 1106 (citations omitted). Nevertheless, the statement of the law is correct.

7

considering the issue of damages regarding lost profits, the proper measure of lost profits is net loss. *Louisiana Smoked Products Inc., v. Savoie Sausage and Food Products Inc.*, 673 So.2d 248, 253 (La. App. 3rd Cir. 1996).

To the extent that Builders Supply relies on its alleged lease from Properties to support its claim, the Court has determined that there was insufficient evidence to establish the existence of a valid lease of the Church Street Land or a valid agreement to lease in the future. [Doc. No. 287, pp. 8-11].

The Court has also considered the remainder of Builders Supply's evidence in the form of the McLarrin's testimony; the testimony of Builders Supply employee, Sam Harris ("Harris"); Dr. Rice's economic analysis; and the potential testimony of Builders Supply's accountant, Gowdy. However, Dr. Rice's projections are based on McLarrin's figures, which he admits are "guesswork." Likewise, Gowdy, although an accountant, has no basis to offer testimony about projected losses from a business which has not yet expanded, although he could testify as to the revenues of the Builders Supply store at the current location. Nevertheless, Builders Supply's claim for lost profits rests almost entirely on the testimony of McLarrin and his employees.

McLarrin testified that the new location would be about four times the size of the Andrews Lane location, which is approximately 6,000 square feet. [Doc. No. 232-8, McLarrin Depo., p. 221]. McLarrin himself admits that he tried to calculate lost profits "to a certain extent," but that his estimate was "guesswork." [Doc. No. 181-4, McLarrin Depo., pp. 126, 160]. Certainly, McLarrin has experience in the general building supply business and the Court has considered that the Builders Supply location at Andrews Lane has had growth and increase in revenues, but McLarrin offers no evidence, only his belief, that the expansion would double (or triple) the profits of Builders Supply.

8

Further, to the extent that Builders Supply intended to sell new products[9] once the expansion was complete, it has offered no evidence of the expenses or costs associated with acquiring these new products, nor has it offered sufficient evidence of the demand for the new products. McLarrin offered only his own testimony that these products could be successfully sold in the new location, but not the costs of acquiring the products or the market evidence to support the demand for the products. *See Louisiana Smoked Prods.*, 673 So.2d at 254 ("The proper measure of damages is . . . gross profit minus expenses."); *Marcel v. Becnel*, No. 96-CA-1139 (La. App. 3rd Cir. 3/27/97), 691 So.2d 1344, 1349 ("[L]oss of profits is generally calculated by deducting the expenses that would have been incurred from the gross revenues that could have been realized."; there must also be "credible evidence showing, with reasonable certainty, the production and operational costs involved in making the invention a marketable product."). Harris confirmed that the store had "requests for steps and septics and different culverts that" were not "in stock," but he could not identify a single customer who said he or she would do more business with Builders Supply if it carried more inventory. [Doc. No. 232-9, Sam Harris Depo., pp. 68-69].

Builder Supply argues that McLarrin testified that the expanded business operations of Builders Supply would have been "up and running within 30 days of the crash," [Doc. No. 232, p. 11] and points out that surveying, staking, and site preparation work had been completed, and construction materials were on site. [Doc. No. 232-19, ¶4]. However, McLarrin actually testified, as corporate representative of Builders Supply, that a storage shed, not the new building, would be completed in that time period and that it would take 3-4 months to build the new store. [Doc. No.

---

[9] In the words of McLarrin, Builders Supply would offer "tremendously different kinds of material" at the Church Street Land location. [Doc. No. 232-8, McLarrin Depo., p. 222].

232-8, McLarrin Depo., pp. 21-22]; [Doc. No. 242-1, Builders Supply Corporate Depo., p. 98]; *see also* [Doc. No. 181-6, Danny Parker Depo., p. 50 (McLarrin was going to build a store at first, but changed his mind and decided to build a storage shed)]. Further, as noted, the objective evidence shows that no construction of any kind had begun, no financing had been obtained, and no lease had been prepared. [10] [Doc. No. 232-19, ¶¶ 4-5].

To the extent that Builders Supply intends to assert a loss of storage claim based on the delay in building the shed, no valuation number was provided.[11]

In sum, while the Court accepts McLarrin's testimony and the other evidence that Builders Supply had plans to expand, the evidence is too speculative to show net losses it might have suffered by the delay in expansion and loss of storage capacity. As Builders Supply cannot establish the loss to a reasonable degree of certainty, the motions for partial summary judgment are also GRANTED as to Builders Supply's claim for loss of future profits from the expansion of the store and lack of storage.

---

[10] Danny Parker, Ricky Sawyer, and Clay Hale, McLarrin's employees, testified that McLarrin changed his mind about what to do with the Church Street Land. *See* [Doc. No. 181-5, Ricky Sawyer Depo., pp. 69-70 ("Randle changes his mind. One time he said he was going to put the lumber yard over there. One time he said he was going to build just a new store."; When asked if he heard anything about storage on the Church Street Land, Sawyer said "No.")]; [Doc. No. 181-7, Harold Clayton Hale, Jr. Depo., p. 114 ("Q. . . What is your understanding of what was going to go on the Church Street land if the collision hadn't happened? A. A building. A big storage building. Q. Okay. So a storage building. Anything else? A. Well, now this is Randle talking so, I mean–and it was never put in stone, I guess you'd say. He had talked about–At one time he talked about building a bigger store over there.")].

[11] Although McLarrin talked about a discount available for buying lumber in greater quantities, he also admitted that he already receives the discount on at least 25% of his lumber sales. [Doc. No. 242-1, Builders Supply Corporate Depo., pp. 21, 98, 103, 104 (McLarrin estimated that the building of the storage shed would take 30 days, and he could get a 10% discount if lumber is bought in bulk, but he was already receiving the discount "[m]ost of the time" or "[s]ometimes," which he then said was about 25%)].

C.     **Loss of Sales of Topsoil**

Properties and Builders Supply also claim that they suffered financial losses from the inability to sell topsoil from the Church Street Land.

First, to the extent that Builders Supply asserts this claim, the Court has found that it has no interest in the Church Street Land and thus cannot seek damages for this alleged loss. To this extent, the moving parties' motions for partial summary judgment are also GRANTED.

Properties, as the owner of the Church Street Land, can assert such a claim if it meets its evidentiary burden. However, the moving parties point to the speculative nature of a claim for damages in the amount of approximately $248,000, when McLarrin could produce only four receipts of $200 each.[12] [Doc. No. 181-11; Doc. No. 181-2]. The moving parties also point out that there is no evidence as to the quality of the topsoil before or after the derailment.

McLarrin testified that the topsoil in question was found on the Church Street Land after it was purchased. He explained that when wild flowers were planted in the soil, "they just took off." [Doc. No. 232-8, McLarrin Depo., p. 198]. McLarrin testified that Builders Supply sold two or three loads of topsoil day for $200 each. However, he could not produce all the receipts because many sales were cash. Following the derailment, however, McLarrin contends that the topsoil had cross ties and cars on top of it, and that there were rocks in the soil from the clean up process. Harris also testified that they did not sell the topsoil after the derailment.

First, to the extent that McLarrin alludes to the environmental contamination of the topsoil, the Court has dismissed any claims for environmental contamination.

However, consistent with the Court's ruling on the trespass claim, Properties has raised a

---

[12]One receipt was for $216, which included $16 for tax.

genuine issue of material fact for trial whether Properties lost sales of topsoil because rocks were left in the soil after the derailment and clean up. Such claim will be limited to the reasonable amounts of sales that Properties can prove at trial.[13] Under these facts, the motions for partial summary judgment on Properties' sale of topsoil is DENIED.

III.  CONCLUSION

For the foregoing reasons, the motions for partial summary judgment on Properties' and Builders Supply's claims for past and future loss of revenues from the anticipated expansion of the business operations [Doc. Nos. 181, 185, 196 & 208] filed by Prewett, Hulcher, College City, Shackleford, Taylor Logistics, Taylor Truck, Taylor Consolidated, and Union Pacific are **GRANTED IN PART AND DENIED IN PART.** To the extent that Properties seeks to recover damages for the loss of sales of topsoil, the motions are **DENIED**. The motions are otherwise **GRANTED**, and Properties' and Builders Supply's claims for past and future loss of revenues from the anticipated expansion are **DISMISSED WITH PREJUDICE**.

MONROE, LOUISIANA, this 17th day of May, 2017.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

---

[13] While the moving parties have characterized this claim as "speculative," their objection is that Properties seeks damages of such a large amount compared to the objective evidence supporting its claim of topsoil sales. However, the receipts that were produced support McLarrin's testimony that he had at least some sales of topsoil prior to the derailment. Further, the Court rejects any claim that Properties was required to perform soil testing to show the quality of the soil. The jury can consider McLarrin's testimony that customers would and did purchase the topsoil prior to the derailment, but would not purchase topsoil with rocks in it.