UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY | CIVIL ACTION NO. 15-0074 |
| VERSUS | JUDGE ROBERT G. JAMES |
| TAYLOR TRUCK LINE, INC., ET AL. | MAG. JUDGE KAREN L. HAYES |

--(consolidated with)--

| | |
|---|---|
| R & L BUILDERS SUPPLY, INC., ET AL. | CIVIL ACTION NO. 15-2460 |
| VERSUS | JUDGE ROBERT G. JAMES |
| UNION PACIFIC RAILROAD COMPANY, ET AL. | MAG. JUDGE KAREN L. HAYES |

RULING

Pending before the Court is a Motion for Summary Judgment on Liability [Doc. No. 209]
filed by Union Pacific Railroad Co. ("Union Pacific"). For the following reasons, the Motion for
Summary Judgment on Liability is DENIED.

I.    FACTS AND PROCEDURAL HISTORY

On October 5, 2014, Daniel Shackleford ("Shackleford") was operating a 2013 Kenworth
tractor with trailer and dolly (hereinafter "tractor-trailer") loaded with a Freuhoff Terex RT-780
crane. Shackleford had picked up the crane in Iowa and was en route to deliver it to a construction
company in Mississippi. The tractor-trailer driven by Shackleford was owned by College City
Leasing, LLC ("College City"), but leased to Taylor Truck Lines, Inc. ("Taylor Truck"). Taylor

Logistics, Inc. ("Taylor Logistics") was the shipment broker.[1]

The trailer's clearance could be adjusted. It had five "teeth" and was set at the second tooth prior to loading. Shackleford decided to leave the trailer at the same setting after the crane was loaded.

Because the load was oversized, Shackleford was traveling through Louisiana with a Louisiana Department of Transportation ("LDOT") Overweight Permit. However, he did not have an escort vehicle, as required by the permit.

At approximately 1:00 p.m., Shackleford was driving the tractor-trailer south on U.S. Highway 165 in Mer Rouge, Louisiana. At the time, he was talking on his cell phone with another driver, Frank Murphy ("Murphy"), using the hands-free mode.

At the intersection of 165 and U.S. Highway 425/La. Highway 2, Shackleford stopped at the stop sign and then turned left onto U.S. Highway 425/La. Highway 2, also known as Davenport Avenue. He then proceeded to the Highway 2/Davenport Avenue highway/railway grade crossing ("the Crossing") over a Union Pacific main line railroad track (identified as DOT crossing number 441-531N at railroad milepost 473.60). There are pavement markings, crossbuck signs, flashing lights, gates, and bells at the Crossing. This was the first time Shackleford had traversed this Crossing, which is somewhat elevated and humped. Shackleford had not contacted Union Pacific to notify it of his intent to traverse the Crossing.

Shackleford did not adjust the ground clearance on the trailer prior to attempting to traverse the Crossing. The trailer became lodged and was "high centered," straddling the tracks. Shackleford

---

[1]Union Pacific also brought suit against Taylor Consolidated, Inc. The Court will refer to these parties collectively as the Taylor Entities.

told Murphy what had happened, but remained on the call with him while he engaged the parking brake, put the tractor in neutral, and exited. Shackleford then attempted to dislodge the trailer by raising the trailer up one "tooth," and then going backwards and forwards. The trailer was still stuck, so he exited again, and raised the trailer another tooth. During the time he was attempting to dislodge the trailer, Shackleford did not notify law enforcement or Union Pacific.[2]

Approximately two minutes after the trailer became lodged on the tracks[3] and before he could try again to dislodge it, a Union Pacific train traveling north on the track, which runs parallel to U.S. Highway 165/La. Highway 138, began to approach the Crossing. The train activated its flashing lights, bells, and crossing gate. When he saw the approaching train, Shackleford exited the truck and ran.

At the time of the accident, Union Pacific engineer, Russell Rowe, was operating the lead locomotive, and Union Pacific conductor, James Kovalyshyn, was in the cab as well. Once they saw the tractor-trailer at the Crossing, crew members applied the emergency brakes in an effort to avoid the collision. The crew members were unsuccessful, and the train collided with the trailer and attached crane. As a result of the collision, approximately 17 railroad cars and 2 locomotives left the railroad tracks, cargo spilled, and a tank car leaked Argon onto surrounding property, including land owned by R & L Properties of Oak Grove, LLC.

---

[2]Murphy recalls telling Shackleford to call 911. [Doc. No. 209, Exh. I, Murphy Depo., p. 53]. Shackleford does not deny Murphy's testimony, but does not recall what Murphy told him. [Doc. No. 209, Exh. A, Shackleford Depo., p. 168].

[3]Shackleford estimated the elapsed time as approximately two minutes. The Mer Rouge Police Chief, Charles Mitchell Stephens, testified that a review of video surveillance from a nearby business showed that Shackleford was stuck on the tracks for one to one and one-half minutes before the collision. [Doc. No. 234, Exh. 4, Deposition of Mitch Stephens, pp. 14-15].

Following the collision, the tractor-trailer was too damaged to measure the exact ground clearance of trailer. Prior to this incident, vehicles had been "stuck" or "hung up" on the track on three occasions: March 18, 2011; October 25, 2011; and May 15, 2014.[4]

On January 14, 2015, Plaintiff Union Pacific brought the instant suit against the Taylor Entities seeking to recover the property damage caused by the accident and derailment.

R & L Properties of Oak Grove, LLC ("Properties") and R & L Builders Supply, Inc. ("Builders Supply") had filed a separate lawsuit against the Taylor Entities, Union Pacific, and Union Pacific's contractors, Prewett Enterprises, Inc., and Hulcher Services, Inc., seeking to recover their damages. On November 4, 2015, the Properties and Builders Supply lawsuit was consolidated with the Union Pacific lawsuit.

Although they have not made a claim against Union Pacific, the Taylor Entities contend that Union Pacific was comparatively negligent in causing the accident for several reasons.

After discovery was complete, Union Pacific filed the instant motion, arguing that there is no genuine issue of material fact for trial that the Taylor Entities are liable for the collision. The Taylor Entities filed an opposition memorandum [Doc. No. 234] to Union Pacific's motion. Union

---

[4][Doc. No. 234, Exh. 3, Jeff DeGraff Depo., pp. 34-35]. The Taylor Entities characterize these incidents as "repetitive and significant history of tractor/trailers becoming stuck on the crossing. . . due to the slope and elevation of the cross and approaching roadways," [Doc. No. 234, p. 2], but Jeff DeGraff's ("DeGraff") testimony does not support that characterization. He states only that Union Pacific maintained a report of calls made to its emergency line "when a vehicle is stuck on a track or is hung up for whatever reason and it is called into [the Response Management Communications Center] to notify our train dispatch, it is logged into the system as vehicle on track. That listing does not indicate that there was an accident." [Doc. No. 234, Exh. 3, DeGraff Depo., pp. 34-35]. DeGraff did not testify about the type of vehicle involved or the reason why the vehicles were stuck, nor does the report itself contain such information. *Id.* at DeGraff Depo., Exh. 100.039. There is certainly no indication that all three incidents involved tractors with lowboy trailers that became high centered on the tracks. If there is other evidence to support the Taylor Entities' contention in their memorandum, it was not cited.

Pacific filed a reply [Doc. No. 251], and the Taylor Entities filed a sur-reply. [Doc. No. 260].

Finally, Union Pacific filed a supplemental reply. [Doc. No. 271].

The Court is now prepared to rule.

## II.   LAW AND ANALYSIS

### A.   Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

### B.   Claims and Issues Resolved by the Court's Prior Rulings

Since the instant motion was originally filed, the Court has ruled on numerous motions in this case, and some of the Court's previous rulings resolved issues raised in the briefing on this motion.  First, the Court granted Union Pacific's Motion for Partial Summary Judgment Regarding Allegations of Inadequate Training of the Train Crew, and opposing parties are precluded from

presenting testimony or arguing to the jury that the Union Pacific train crew were not properly trained or instructed or were not qualified to operate the locomotive and train. [Doc. No. 290]. Second, the Court granted Union Pacific's Motion for Partial Summary Judgment on the Issue of Preemption of Liability for Additional Signs or Signalization at the Crossing, and the Taylor Entities and other opposing parties are precluded from presenting testimony or arguing that Union Pacific was negligent or at fault for failing to post a low clearance warning sign because such a claim or defense is preempted by the Federal Railroad Safety Act ("FRSA"). [Doc. No. 344]. Third, the Court granted Union Pacific's Motion for Partial Summary Judgment Regarding Speed, and the Taylor Entities and other opposing parties are precluded from presenting testimony or arguing to the jury in support of a claim or defense that Union Pacific was negligent based on the speed of the train at the time of the collision. [Doc. No. 359]. Finally, the Court denied the Taylor Entities' Motion for Summary Judgment, finding that LA. REV. STAT. § 32:174 is not preempted by the FRSA. [Doc. No. 362]. Thus, there are no genuine issues of material fact for trial that Union Pacific was negligent for failing to adequately train or instruct its crew, for failing to post a low clearance warning sign, or based on the speed of its train at the time of the collision. As these arguments have been resolved as indicated, the Court will not address them again. With respect to arguments about the application of LA. REV. STAT. § 32:174, the Court has resolved the issue of preemption, but the Court will address remaining arguments in this Ruling.

C.     **Duty-Risk Analysis**

Under Louisiana law, negligence claims are subject to a duty risk analysis containing five elements: "(1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) whether the defendant's conduct failed to conform to the appropriate standard (the

breach element); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element; and (5) whether the plaintiff was damaged (the damages element)." *Hanks v. Entergy Corp.*, 944 So.2d 564, 579 (La. 2006)

Union Pacific moves for summary judgment on the bases that the Taylor Entities held several duties which they, through Shackleford, breached, and the breach of these duties was the factual and legal causes of Union Pacific's damages.

### 1. Duty to Have Escort Driver

First, Union Pacific contends that Shackleford had a duty to travel with a civilian escort based on the type of load being hauled. It is undisputed that Shackleford obtained a LDOT Overweight Permit required for lawful use of Louisiana highways. It is further undisputed that the permit required Shackleford to have a civilian escort. [Doc. No. 209, Exh. B., Overnight Permit].

However, in their opposition memorandum, the Taylor Entities point out that escorts are not necessarily local or even from the state in which they provide the escort and do not always have local knowledge of the route which they are traveling. Therefore, the Taylor Entities argue that Shackleford's failure to obtain an escort would not have prevented the accident.

Union Pacific argues that the Taylor Entities' own representative, Adam Severin ("Severin"), Shackleford's direct supervisor, admitted that Shackleford's failure to obtain an escort driver was a "factor" in the accident and that an escort driver, among other things, could have contacted the railroad for the driver if there was any concern that he could not safely traverse the Crossing. [Doc. No. 209, Exh. J, Severin Depo., pp. 26, 60, 72, 100-101].

The Court finds that it is clear as a matter of law that Shackleford had a duty to travel with a civilian escort and that he breached that duty. However, the Court finds that there are genuine issues of material fact for trial whether the failure to travel with an escort caused the accident. It is possible that the escort may have been familiar with the Crossing if he had traveled the route before. It is also possible that the escort might have called Union Pacific before Shackleford attempted to traverse the Crossing. It is further possible that the escort might have called 911 or Union Pacific once Shackleford became lodged on the tracks, but, at most, two minutes elapsed between the time the trailer became stuck, and the time the train began to approach. Thus, it is unclear whether a call by anyone would have prevented the accident at that point. While the jury can consider Severin's admission the lack of an escort was a "factor" in the accident, his lay opinion is not dispositive on the element of causation, even if it is unfavorable for his employer. Viewing the facts in the light most favorable to the Taylor Entities, Union Pacific has failed to establish causation based on all of these possibilities, and, therefore, it is not entitled to summary judgment on this claim.[5]

Union Pacific may still prevail on its Motion for Summary Judgment on Liability if it can establish all the elements of negligence as to one or more of Shackleford's other legal duties, and there are no genuine issues of material fact on Union Pacific's alleged comparative negligence. Therefore, the Court must consider the Taylor Entities' other alleged duties and Union Pacific's alleged comparative negligence.

---

[5]The Taylor Entities seems to argue that they are entitled to summary judgment on this claim, but they did not file a motion for summary judgment, only an opposition to Union Pacific's motion. Regardless, genuine issues of material fact preclude summary judgment for any party on this claim.

## 2.     Duty of Professional Drivers

Next, Union Pacific contends that, as a matter of law, Shackleford had duties as a professional truck driver under Louisiana law.  Professional truck drivers are recognized as superior actors and are held to a high standard of care.  *See Theriot v. Bergeron*, 939 S.2d 379, 383 (La. App. 1st Cir. 2006); *Davis v. Witt*, 851 So.2d 1119 (La. 2003).  A professional driver's duties include an understanding of the truck he is operating and the specifications of the load he is pulling.  *See Theriot*, 939 So.2d at 383.   Among the general duties of a professional truck driver, Union Pacific points to two particular duties.  First, Shackleford was aware of the low clearance of the load he was hauling, but failed to raise the clearance of the trailer to a higher setting (which could have been done) before attempting to traverse the Crossing.  Second, once the trailer became "high centered" on the track, Shackleford failed to call 911 or the emergency number posted at the Crossing.  If Shackleford had taken either of the actions, Union Pacific argues that the collision could have been prevented.

The Taylor Entities respond that even if the tractor-trailer had nine inches of ground clearance, their expert, Kelley Adamson ("Adamson"), who has a master's degree in civil engineering, opines that the tractor-trailer would still have become lodged on the tracks.  *See* [Doc. No. 234, Exh. 2, Adamson Aff.].  Prior to issuing his opinion, among other actions, Adamson (1) visited the Crossing, (2) inspected an exemplar tractor-trailer with the same make, model, and dimensions as the one driven by Shackleford loaded with a crane of the same make, model, dimensions, and weight, (3) reviewed the accident report, (4) looked at the LDOT highway plans, (5) reviewed multiple depositions of witnesses, (6) viewed 3 videos of the accident, as well as photographs, and (7) reviewed a number of publications.

Union Pacific responds that Adamson's affidavit should be stricken as containing inadmissible legal opinions on causation and the application of certain publications. However, with regard to the opinion on clearance, the Court finds no basis to strike Adamson's affidavit. At the least, this opinion raises a genuine issue of material fact for trial as to whether Shackleford's failure to raise the clearance of the trailer was a cause of the accident.

Additionally, the Court finds genuine issues of material fact for trial as to whether Shackleford's failure to call 911 or Union Pacific's emergency number when he became lodged on the tracks was a cause of the accident. Given the fact that no more than 2 minutes passed between the time he became lodged, and the time the train approached the Crossing,[6] it is not clear as a matter of law that such a call would have prevented the collision. Accordingly, even if Shackleford breached his professional duties, there is a genuine issue of material fact for trial as to whether his breach was the factual and legal cause of Union Pacific's damages.

### 3.    Duty to Notify of Intent to Traverse Crossing

Finally, Union Pacific contends that Shackleford had a duty to notify Union Pacific of his intent to traverse the Crossing under the plain language of LA. REV. STAT. § 32:174, that he breached this duty, and that his breach was the factual and legal cause of the collision. The Taylor Entities deny that the cited Louisiana statute applies to tractor-trailers generally; that even if the statute applies to tractor-trailers, there is no evidence that Shackleford's loaded trailer had less than nine inches of clearance; and, even if the statute applied, Shackleford's technical violation is excused because it was impossible to comply with the notification requirement.

---

[6]The Chief of Police estimated the time at 1 to 1 ½ minutes, based on his review of the video, but, even using Shackleford's more generous estimate of 2 minutes, the Court finds an genuine issue of material fact for trial.

### a.    Application to Tractor-Trailer Transporting a Crane

Louisiana Revised Statute § 32:174, which addresses the moving of heavy equipment across railroad grade crossings, provides in pertinent part:

A.    **No person shall operate or move** any crawler-type tractor, steam shovel, derrick, roller, or **any equipment or structure having** a normal operating speed of ten or less miles per hour or **a vertical body or load clearance** of less than one-half inch per foot of the distance between any two adjacent axles or in any event **of less than nine inches, measured above the level surface of a roadway, upon or across any tracks at a railroad grade crossing without first complying with this Section**.

B.    Notice of any such intended crossing shall be given to a station agent of such railroad and a reasonable time be given to such railroad to provide proper protection at such crossing.

C.    Before making any such crossing the person operating or moving any such vehicle or equipment shall first stop the same not less than fifteen feet nor more than fifty feet from the nearest rail of such railroad and while so stopped shall listen and look in both directions, and shall not proceed until the crossing can be made safely.

(emphasis added).  Union Pacific contends that Shackleford was operating equipment with a load that weighed in excess of 90,000 pounds and that had a ground clearance of less than nine inches. Thus, Union Pacific argues that Shackleford had a duty to contact the railroad prior to attempting to traverse the Crossing.

The Taylor Entities respond that tractor-trailer is not "equipment" or a "structure," and the statute is inapplicable.

Because jurisdiction is premised on diversity of citizenship in this case, Louisiana rules of statutory interpretation apply. Under Louisiana law, the ultimate goal of statutory interpretation is to discern the Legislature's intent. The Louisiana Supreme Court has consistently described the proper technique for interpreting Louisiana statutes:

> [T]he function of statutory interpretation and the construction given to legislative acts rests with the judicial branch of government. The rules of statutory construction are designed to ascertain and enforce the intent of the Legislature. Legislation is the solemn expression of legislative will and, thus, the interpretation of legislation is primarily the search for the legislative intent. We have often noted the paramount consideration in statutory interpretation is ascertainment of the legislative intent and the reason or reasons which prompted the Legislature to enact the law.
>
> The starting point in the interpretation of any statute is the language of the statute itself. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in the search of the intent of the legislature. However, when the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. Moreover, when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole.

*M.J. Farms, Ltd. v. Exxon Mobil Corp*., 2007-2371, (La. 7/1/08); 998 So.2d 16, 26-27 (citations omitted).

Applying these principles, the Court must consider, first, the language of the statute. The applicable portion provides : "[n]o person shall operate or move . . . any equipment or structure having a vertical body or load clearance . . . of less than nine inches, measured above the level surface of the road."[7] LA. REV. STAT. § 32:174(A). Neither the statute nor subpart F of Title 32, which addresses the specific subject of "Railroad Grade Crossings," defines "operate," "move," "equipment," or "structure." However, the Court finds that language to be clear. It was the intent of the Louisiana Legislature in enacting LA. REV. STAT. § 32:174 to regulate "Moving heavy equipment at railroad crossings." In this case, Shackleford was indeed operating a tractor with a lowboy trailer, but he was using the tractor-trailer to move heavy equipment–a crane.

---

[7]Union Pacific does not contend that Shackleford was operating a crawler-type tractor, steam shovel, derrick, or roller, but that his moving of a crane on a trailer with less than nine inches of clearance falls within the "equipment" or "structure" residual language of the statute.

*See St. Louis S.W. Ry. v. Pierce*, 68 F.3d 276 (8th Cir. 1995) (finding that the plain and unambiguous

language of the Arkansas Heavy Equipment Statute requiring notification when a person operated

or moved "any equipment" across a railroad grade crossing properly applied to a legally licensed

tractor-trailer transporting a bulldozer);[8] *see generally Kansas City So. Ry. Co. v. Stoddard*, Civil

Action No. 11-724, 2013 WL 55920 at * (W.D. La. Jan. 3, 2013) (Although not presented with the

precise issue, another judge of this District did not question the application of La. Rev. Stat. § 32:174

to a tractor-trailer hauling a compressor; instead he declined to hold a state trooper liable for the

failure to comply when, among other reasons, the trooper had not been  provided with the load

clearance). [9]  Therefore, contrary to the Taylor Entities' contention, the Court need not apply other

---

[8]The Arkansas Heavy Equipment Statute provided as follows:

27–51–705 Moving heavy equipment at crossings

(a) No person shall operate or move any crawler-type tractor, steam shovel, derrick, roller, or any equipment or structure having a normal operating speed of up to ten (10) miles per hour or a vertical body or load clearance of less than one-half inch (½") per foot of the distance between any two adjacent axles, or, in any event, of less than nine inches (9") measured above the level surface of a roadway, upon or across any tracks at a railroad grade crossing without first complying with this section.

(b) Notice of any intended crossing shall be given to a station agent of the railroad, and a reasonable time shall be given to the railroad to provide protection at the crossing.

ARK. REV. STAT. 27-51-705 (*quoted in St. Louis Sw. Ry. Co. v. Pierce*, 68 F.3d at 277).

[9]The Taylor Entities rely on an unpublished decision, *Davis v. Union Pacific Ry. Co.*, Docket No. 1:12-cv-00212 (S.D. Tex. 2015) [Doc. No. 67], in which the district court found that a tractor-trailer hauling a crane did not fit within the meaning of a similar Texas statute.  They also rely on the definitions in Title 32, Chapter 1, which define a trailer as a "vehicle," not equipment.  *See* LA. REV. STAT. § 32:1(92) (A "Vehicle" is defined as "every device by which persons or things may be transported upon a public highway or bridge, except devices moved by human power or used exclusively upon stationary rails or tracks. . . . a trailer or semitrailer shall

tenets of statutory construction to determine legislative intent.  The Court finds that the statute

applied to Shackleford if the clearance of the lowboy trailer loaded with the crane was less than nine

inches.

### b.      Evidence of Load Clearance

The Taylor Entities argue, however, that Union Pacific has failed to establish the load

clearance of less than nine inches.  The Court disagrees.  The collision caused such damage as to

prevent a measurement of the clearance of the trailer after the fact.  However, Union Pacific properly

relies on the deposition testimony of Shackleford, who supervised the loading of the crane, drove

the tractor-trailer, and physically adjusted the clearance immediately prior to the collision.  While

Shackleford refused to give an estimate in inches, he demonstrated the clearance level on two

occasions during his videotaped deposition, and both demonstrations clearly indicate fewer than nine

inches of clearance to any reasonable viewer.  [Doc. No. 209, Exh. F].[10]

---

be a separate vehicle.").  Union Pacific does not contend (and the Court has not found) that the statute applies to every vehicle, but only to a tractor with a low-boy trailer hauling extremely heavy equipment. The *Davis* decision does not appear to make this distinction, but simply finds that a tractor-trailer is a "vehicle" and thus could not be "equipment," regardless of its load.  The Court respectfully disagrees.  Shackleford did not attempt to traverse the Crossing with an empty trailer, and the Court offers no opinion as to whether the statute would apply if he had.

[10]"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) ("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene."). However, video evidence is not a source of uncontroverted fact if "[t]he contents of the video are too uncertain to discount [the plaintiff's] version of the events under *Scott*." *Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013).  In this case, the Taylor Entities argue that there is no evidence of the amount of ground clearance, but Shackleford demonstrated on video not once, but twice, his recollection of the load clearance, and no reasonable jury could find the measurement to be nine inches or greater. Shackleford further testified that the setting used in

The Taylor Entities also argue that Shackleford was unsure whether the clearance setting at tooth 2 was one level from the highest setting or one level from the lowest setting. That argument ignores Shackleford's detailed account of his actions immediately prior to the collision. He stated that he left the tractor and adjusted the clearance level once and returned to the tractor to try to move the tractor-trailer off the tracks. When that effort was unsuccessful, he testified that he *again* adjusted the clearance level. [Doc. No. 209, Exh. A, Shackleford Depo., pp. 179-80]. While, unfortunately, the train began approaching before he could make a second attempt to extricate the tractor-trailer, Shackleford could not have adjusted the clearance level more than once if it had originally been set at the second to highest level.

Further, Shackleford's testimony is supported by the Taylor Entities' own company witness, Gerald Anderson ("Anderson"). [Doc. No. 209, Exh. E, Anderson Depo.].[11] Anderson testified that Shackleford was using a Fontaine trailer which, at its highest setting, had approximately twelve

---

transporting the crane was his usual setting for oversized loads, indicating that he had more than a one-time familiarity with the clearance he demonstrated. *See* [Doc. No. 209, Exh. A, Shackleford Depo., p. 70 ("I couldn't give you how many inches off the ground it would be where I would set the trailer at. I always set them on No. 2 teeth.")].

[11]The Taylor Entities object that Anderson was not sworn at the time of his deposition, so his testimony is inadmissible. While unsworn testimony may normally constitute hearsay, Anderson's statements were admissions of a party opponent and thus may be considered by the Court as non-hearsay. *See* FED. R. EVID. 801(d)(2)(A), (C)-(D) (A "statement" is not hearsay if it is "offered against an opposing party and" either "was made by the party in [a] . . . representative capacity[,]" or "was made by a person whom the party authorized to make a statement on the subject[,]" or "was made by the party's agent or employee on matter within the scope of that relationship and while it existed."). Further, the Taylor Entities do no dispute the accuracy of the cited testimony or present an affidavit or other evidence from Anderson indicating that he would testify differently at trial.

inches of clearance in the front, and "maybe as much as eight or nine in the rear."[12] *Id.* at p. 49. It is undisputed that Shackleford was not using the highest setting on the trailer, so Anderson's testimony makes clear that the trailer loaded with the crane had less than nine inches of clearance in the rear. *See also id.* at p. 69 (testifying that the 2013 Fontaine trailer used for heavy hauls was typically set to a "ride position" with "five to six inches" of clearance).[13]

Therefore, Shackleford had a duty to give "[n]otice of any such intended crossing . . . to a station agent of such railroad and a reasonable time be given to such railroad to provide proper protection at such crossing." LA. REV. STAT. § 32:174 (B).

### c. Ability to Give the Required Notice

The Taylor Entities raise a final argument to the application of LA. REV. STAT. § 32:174. They contend that it was impossible for Shackleford to comply with the statute because Union Pacific does not have a "station agent," to whom notice could be given. Relying on their expert, Alan Blackwell ("Blackwell"), a former employee of Union Pacific, they point out that there is no

---

[12]The Taylor Entities contend that Anderson's testimony is insufficient to establish the clearance of Shackleford's trailer at the time he attempted to traverse the Crossing because Anderson admits that he never saw the actual trailer and was not present when Shackleford attempted to traverse the Crossing. However, Anderson clearly testified the trailer could only have had nine inches of clearance if it was set at the highest setting, and, no matter how Shackleford's testimony is understood, there is no doubt that he did not have the trailer set at the highest clearance level.

[13]The Taylor Entities also argue that there are many Fontaine trailers, but Anderson was presented as a witness with knowledge in this particular case. Although he did not refer to the specific type or model of trailer in his initial testimony, during later questioning he *was* asked about the type of trailer Shackleford was using. He did not equivocate or try to differentiate his earlier testimony in any way.

listed position with the company known as "station agent."[14] [Doc. No. 234, Exh. 7, Blackwell Aff., at ¶ 4]. Union Pacific has a "depot agent," but no such agent was employed at the Crossing. *Id.* at ¶ 6.

Union Pacific responds that the unequivocal evidence demonstrates that compliance was not impossible. If Shackleford had called Union Pacific at the number listed at the Crossing, steps would have been taken to prevent the collision in the event that, as it did, the tractor-trailer became lodged on the tracks. Union Pacific's Response Management Communication Center ("RMCC") Coordinator, Brian Jarrett ("Jarrett"), testified that the railroad is contacted on a daily basis by trucking companies about making a safe crossing. Those are generally made as immediate requests, and Jarrett explained the procedure once such a request is made:

> . . . With the immediate request, we . . . tell them to refrain or stop from going over our crossing until we can notify train management.
>
> . . . We keep that reporting party on hold. We get ahold [sic] of the train dispatcher, ask for a safe passage for this high/wide load or driver at which point . . . they will tell us he's – it's either safe to proceed, or there are times where they will say, "We have got trains in the immediate area. Wait until a certain train crosses through the crossing, at which point in time it will be safe to pass.'"

[Doc. No. 209, Exh. H, Jarrett Depo., p. 64]. When presented with the hypothetical situation that Shackleford had called before attempting to traverse the Crossing, Jarrett explained further:

> We would have explained to Mr. Shackleford to stay on the phone with us while we contacted the train dispatcher. We actually call the train dispatcher on the same Avtec radio so it lights off that red strobe. We do treat it as an emergency in terms of that because we have had incidents in the past where people have gotten antsy or crossed the tracks without our permission without knowing whether . . . train traffic is stopped. . . .

---

[14]Union Pacific challenges the admissibility of some of Blackwell's opinions, but there can be little doubt that a 24-year employee of Union Pacific and its predecessors with Blackwell's background has the knowledge to give an affidavit on this particular issue.

Again, they will tell us whether it's either safe to proceed or whether they need to wait for a passing train to get through the crossing.

We will then relay that message to the requesting party, and then we will stay on the phone with that requesting party or have that requesting party call us back as soon as they are clear of the crossing.

*Id.* at pp. 64-65.

In an older case, the Second Circuit Court of Appeals placed the emphasis on determining the reasonableness of the defendant's failure to comply with the statute:

The violation of a safety statute does not in and of itself constitute actionable negligence; it must also be shown that the action which contravenes a statute is unreasonable under the circumstances and causes the harm of which plaintiff complains.

*Stephens v. State Through Dep't of Transp. & Dev.*, Nos. 15724-CA to 15726-CA (La. App. 2d Cir. 10/24/83); 440 So.2d 920, 928, *writ denied sub nom.*, 443 So.2d 1119 (La. 1984).[15]    In another decision, the First Circuit Court of Appeals characterized the proper analysis differently:

We believe that to properly determine the breach question, the issue is more properly framed as follows: Did the defendant's conduct, under the particular facts and circumstances, contravene the policy behind the imposition of the duty? . . . Or, is this particular risk within the scope of the risks that led to the imposition of the duty in the first place? Thus framed, the focus is shifted from reasonableness of the defendant's conduct despite the violation, to whether the defendant's conduct or actions constituted a risk "within the ambit of defendant's duty."

*Snyder v. Bergeron* (La. App. 1 Cir. 12/23/86); 501 So.2d 291, 294-95 (quoting *Boyer v. Johnson*, No. 61095 (La. 6/19/78); 360 So.2d 1164, 1167). On the other hand, an "excused" violation may not constitute negligence. *See generally Jackson v. Beechwood, Inc.,* 180 So. 2d 732, 733 (La. App.

---

[15]The *Stephens* Court also stated that violation of a "safety statute" creates a rebuttable presumption of negligence, 440 So.2d at 928, but that is no longer the law. *See Snyder,* 501 So.2d at 294-95; *see also Boudreaux v. State, DOTD*, 2010-189 (La. App. 3 Cir. 11/3/10), 49 So. 3d 1041, 1044 (The "doctrine of negligence per se is no longer Louisiana law.").

1st Cir. 11/16/65).

Under either standard, the Taylor Entities have failed to raise a genuine issue of material fact for trial that Shackleford's compliance was impossible.  While Union Pacific did not have an employee designated as the "station agent," the telephone number was available at the Crossing, and Union Pacific has presented evidence that a call to the railroad would have initiated a safe crossing process.  The very purpose of La. Rev. Stat. § 32:174 is to prevent collisions between trains and persons moving heavy equipment across the tracks.  Shackleford took no action whatsoever before he began traversing the Crossing, so the Taylor Entities have not raised a genuine issue of material fact for trial that he exercised "reasonable diligence or care to comply" with the statute.  [Doc. No. 234, p. 16 (citing *Jackson,* 180 So. 2d at 733)].  Thus, it appears that Union Pacific has presented evidence to support a finding of some liability against the Taylor Entities.  However, before determining whether Union Pacific is entitled to summary judgment on complete liability, the Court must consider all possible causes.

**4.      Taylor Entities' Defenses/Comparative Negligence of Union Pacific**

Even if Shackleford's breach of duties was at least one of the causes of the collision, the Court cannot grant summary judgment on liability unless there are no genuine issues of material fact for trial on the Taylor Entities' defenses.   Under Louisiana Civil Code article 2323, in any action for damages where a person suffered injury,

> the degree or percentage of fault of all persons causing or contributing to the injury . . . or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.  If a person suffers injury . . . the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be

reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury . . . or loss.

"Ordinarily, the determination of whether negligence exists in a particular case is a question of fact; therefore, cases involving a question of negligence ordinarily are not appropriate for summary judgment . . . This principle extends to a question of comparative fault as well." *Pruitt v. Nale*, 45,483 (La. App. 2 Cir. 8/11/10), 46 So. 3d 780, 783 (citing *Freeman v. Teague*, 37, 932 (La. App. 2d Cir.12/10/03), 862 So.2d 371; *Powers v. Tony's Auto Repair, Inc.* 98–1626 (La.App. 4th Cir.4/28/99), 733 So.2d 1215, writ denied, 99–1552 (La.7/2/99), 747 So.2d 28.). "However, where reasonable minds cannot differ, a question of comparative fault is a question of law that may be resolved by summary judgment." *Id.* (citing *Rance v. Harrison Co.*, 31,503 (La.App.2d Cir.1/20/99), 737 So.2d 806, writ denied, 99–0778 (La.4/30/99), 743 So.2d 206.).

As discussed previously, the Court has already ruled on and rejected some of the Taylor Entities' defenses as a matter of law with regard to the comparative negligence of Union Pacific. The Court granted summary judgment to Union Pacific on the issues of the crew's training, the speed of the train, and the failure to post a low clearance warning sign. The Court now considers the remaining defenses.

First, the Taylor Entities argue that Union Pacific generally failed to exercise reasonable care. To the extent that they rely on the action or inaction of the train crew, the Taylor Entities have not produced evidence raising a genuine issue of material fact for trial. The evidence shows that as soon as the train crew saw Shackleford's tractor-trailer, the crew engaged the emergency brakes.

Second, the Taylor Entities raise a defense based on Union Pacific's alleged failure to properly construct, repair, and/or maintain the Crossing and approaching road. With regard to the

road, pursuant to LA. REV. STAT. § 45:323, Union Pacific's duty was limited to the maintenance of "the portion of the street lying between the rails of the tracks of such railroad and railways, and for a distance of two feet on the outside of each rail." Thus, to the extent that the Taylor Entities argue that Union Pacific is liable for the condition of the approaching highway, the highway not within its control, and there is no basis for a comparative negligence claim against Union Pacific.

On the other hand, Union Pacific does have the responsibility for properly constructing, repairing, and maintaining its Crossing and the limited portion of the street or roadway detailed in the state statute, as well as under federal law. *See* C.F.R. Part 213. The Taylor Entities contend that Union Pacific failed to comply with the American Association of State Highway and Transportation Officials' ("AASHTO") Policy on Geometric Design of Highways and Streets and the Railroad-Highway Design Handbook issued by the Department of Transportation and Federal Highway Administration and that this failure, along with the height of the Crossing and the slope of the approaching roadway were all causes of the accident. They contend further that Union Pacific was aware of the need for repair and maintenance of the Crossing because of at least three prior incidents when vehicles became stuck on the tracks at the Crossing. Finally, the Taylor Entities present evidence of gouge marks on the tracks, which Adamson avers is indicative of other low clearance vehicles struggling to clear the Crossing.

Union Pacific responds that it had no legal duty to ensure that railroad tracks are the same level as the approaching highway, the Crossing was in adequate repair, and it was not a legal cause of the accident. Union Pacific argues further that professional guidelines, such as AASHTO, are not standards with which it must comply.

The parties have argued strenuously about the importance of the professional guidelines and

whether the State's adopting of AASHTO guidelines transforms the guidelines into required standards. However, the Court not reach the "guidelines versus standards" arguments for purposes of resolving the instant motion. Further, the Court need not consider Union Pacific's objections to the affidavits from Adamson, Blackwell, Bill Shrewsberry, Gretchen Ferguson, and Melvin Hicks based on the limited briefing provided.[16] The Court finds that the Taylor Entities have presented sufficient evidence to raise a genuine issue of material fact for trial on Union Pacific's comparative negligence in constructing, repairing, or maintaining the Crossing, so that it did not present an obvious danger to Shackleford, who had not traversed this Crossing before. Accordingly, the Court finds that Union Pacific is not entitled to summary judgment on liability.

## III.    CONCLUSION

For the foregoing reasons, Union Pacific's Motion for Summary Judgment on Liability [Doc. No. 209] is DENIED.

MONROE, LOUISIANA, this 29th day of September, 2017.

_____
**ROBERT G. JAMES**
**UNITED STATES DISTRICT JUDGE**

---

[16]Union Pacific may file a *Daubert* motion or a motion *in limine*, if appropriate.