# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| **UNION PACIFIC RAILROAD COMPANY** | **CIVIL ACTION NO. 15-0074** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **TAYLOR TRUCK LINE, INC., ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

**--(consolidated with)--**

| | |
|---|---|
| **R & L BUILDERS SUPPLY, INC., ET AL.** | **CIVIL ACTION NO. 15-2460** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **UNION PACIFIC RAILROAD COMPANY, ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

# RULING

Pending before the Court is a Second Motion for Partial Summary Judgment on Liability [Doc. No. 380] filed by Plaintiff Union Pacific Railroad Co. ("Union Pacific") and a related "Motion to Strike; Alternatively Motion to Stay Ruling and Leave to Conduct Additional Discovery" ("Motion to Strike") [Doc. No. 389] filed by Defendants Daniel Shackleford ("Shackleford"), College City Leasing, LLC ("College City"), Taylor Truck Lines, Inc. ("Taylor Truck"), Taylor Logistics, Inc. ("Taylor Logistics"), and Taylor Consolidated, Inc. (collectively, "the Taylor Entities").

For the following reasons, the Motion to Strike is DENIED, and the Second Motion for Partial Summary Judgment on Liability is GRANTED.

## I.    FACTS AND PROCEDURAL HISTORY

On October 5, 2014, Shackleford was operating a 2013 Kenworth tractor with trailer and

dolly (hereinafter "tractor-trailer") loaded with a Freuhoff Terex RT-780 crane. Shackleford had picked up the crane in Iowa and was en route to deliver it to a construction company in Mississippi. The tractor-trailer driven by Shackleford was owned by College City, but leased to Taylor Truck. Taylor Logistics was the shipment broker.

The trailer's clearance could be adjusted. It had five "teeth" and was set at the second tooth setting prior to loading. However, Shackleford decided to leave the trailer at the same setting after the crane was loaded.

Because the load was oversized, Shackleford was traveling through Louisiana with a Louisiana Department of Transportation ("LDOT") Overweight Permit. However, he did not have an escort vehicle, as required by the permit.

At approximately 1:00 p.m., Shackleford was driving the tractor-trailer south on U.S. Highway 165 in Mer Rouge, Louisiana. At the time he was talking on his cell phone with another driver, Frank Murphy ("Murphy"), using the hands-free mode.

At the intersection of 165 and U.S. Highway 425/La. Highway 2, Shackleford stopped at the stop sign and then turned left onto U.S. Highway 425/La. Highway 2, also known as Davenport Avenue. He then proceeded to the Highway 2/Davenport Avenue highway/railway grade crossing ("the Crossing") over a Union Pacific main line railroad track (identified as DOT crossing number 441-531N at railroad milepost 473.60). There are pavement markings, crossbuck signs, flashing lights, gates, and bells at the Crossing. This was the first time Shackleford had traversed this Crossing, which is elevated and/or humped. Shackleford had not contacted Union Pacific to notify it of his intent to traverse the Crossing.

Shackleford did not adjust the ground clearance on the trailer prior to attempting to traverse

the Crossing. The trailer became lodged and was "high centered," straddling the tracks. Shackleford told Murphy what had happened, but remained on the call with him while he engaged the parking brake, put the tractor in neutral, and exited. Shackleford then attempted to dislodge the trailer by raising the trailer up one "tooth," and then going backwards and forwards. The trailer was still stuck, so he exited again, and raised the trailer another tooth. During the time he was attempting to dislodge the trailer, Shackleford did not notify law enforcement or Union Pacific.[1]

Approximately two minutes after the trailer became lodged on the tracks[2] and before he could try again to dislodge it, a Union Pacific train traveling north on the track, which runs parallel to U.S. Highway 165/La. Highway 138, began to approach the Crossing. The train activated its flashing lights, bells, and crossing gate. When he saw the approaching train, Shackleford exited the truck and ran.

At the time of the accident, Union Pacific engineer, Russell Rowe, was operating the lead locomotive, and Union Pacific conductor, James Kovalyshyn, was in the cab as well. Once they saw the tractor-trailer at the Crossing, crew members applied the emergency brakes in an effort to avoid the collision. The crew members were unsuccessful, and the train collided with the trailer and attached crane. As a result of the collision, approximately 17 railroad cars and 2 locomotives left the railroad tracks, cargo spilled, and a tank car leaked Argon onto surrounding property,

---

[1] Murphy recalls telling Shackleford to call 911. [Doc. No. 209, Exh. I, Murphy Depo., p. 53]. Shackleford does not deny Murphy's testimony, but does not recall what Murphy told him. [Doc. No. 209, Exh. A, Shackleford Depo., p. 168].

[2] Shackleford estimated the elapsed time as approximately two minutes. The Mer Rouge Police Chief, Charles Mitchell Stephens, testified that a review of video surveillance from a nearby business showed that Shackleford was stuck on the tracks for one to one and one-half minutes before the collision. [Doc. No. 234, Exh. 4, Deposition of Mitch Stephens, pp. 14-15].

3

including land owned by R & L Properties of Oak Grove, LLC.

Following the collision, the tractor-trailer was too damaged to measure the exact ground clearance of trailer. Prior to this incident, vehicles had been "stuck" or "hung up" on the track on three occasions: March 18, 2011; October 25, 2011; and May 15, 2014.[3]

On January 14, 2015, Union Pacific brought the instant suit against the Taylor Entities seeking to recover the property damage caused by the accident and derailment.

R & L Properties of Oak Grove, LLC ("Properties") and R & L Builders Supply, Inc. ("Builders Supply") had filed a separate lawsuit against the Taylor Entities, Union Pacific, and Union Pacific's contractors, Prewett Enterprises, Inc., and Hulcher Services, Inc., seeking to recover their damages. On November 4, 2015, the Properties and Builders Supply lawsuit was consolidated with the Union Pacific lawsuit.

Although they have not made a claim against Union Pacific, the Taylor Entities raised the affirmative defense of Union Pacific's comparative negligence.

After discovery was complete, Union Pacific filed a Motion for Partial Summary Judgment, arguing that there is no genuine issue of material fact for trial that the Taylor Entities are liable for the collision. After briefing was complete, the Court issued a ruling granting in part and denying in part Union Pacific's Motion for Partial Summary Judgment on Liability. Since that time, Union Pacific obtained leave of Court to file a second motion to raise a preemption argument. Briefing is now complete, and the Court is prepared to rule.

## II.     LAW AND ANALYSIS

---

[3]As previously noted, the evidence does not provide whether these incidents involved lowboy trailers.

### A. Motion to Strike

The Taylor Entities argue that Union Pacific negligently failed to properly construct, repair, and/or maintain the Crossing and approaching road. The Taylor Entities contend, specifically, that the elevation of the Crossing was both unreasonably dangerous and failed to comply with certain "standards" on the slope of the Crossing. They contend further that Union Pacific was aware of prior incidents when vehicles became stuck on the tracks at the Crossing. Finally, the Taylor Entities present evidence of gouge marks on the tracks, which their expert avers is indicative that other low clearance vehicles struggled to clear the Crossing.

In its initial Motion for Partial Summary Judgment, Union Pacific argued that it had no legal duty to ensure that railroad tracks are the same level as the approaching highway, the Crossing was in adequate repair, and it was not a legal cause of the accident. Union Pacific argued further that professional guidelines are not standards with which it must comply. In denying the motion, the Court concluded that "the Taylor Entities have presented sufficient evidence to raise a genuine issue of material fact for trial on Union Pacific's comparative negligence in constructing, repairing, or maintaining the Crossing, so that it did not present an obvious danger to Shackleford, who had not traversed this Crossing before. Accordingly, the Court finds that Union Pacific is not entitled to summary judgment on liability." [Doc. No. 363, p. 22].

However, on January 16, 2018, Union Pacific moved the Court for leave to "re-urge it motion for partial summary judg[ ]ment, for leave to file a post-ruling/supplemental brief and for expedited consideration." [Doc. No. 378]. Union Pacific sought to brief the Court on its contention that the Taylor Entities' "allegation of comparative negligence is expressly preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), 49 USCS

§10101, et. seq." [Doc. No. 378, p.2].

On January 29, 2018, the Court granted Union Pacific's motion, filed its brief in the record, construing the brief "as a second motion for partial summary judgment on the issue of preemption under the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10101, *et seq.*" [Doc. No. 379]. The Court further instructed the Clerk of Court to issue a Notice of Motion Setting. *Id.*

In response, the Taylor Entities filed a memorandum in opposition to the Second Motion for Partial Summary Judgment on Liability, but they also filed the instant Motion to Strike. The Taylor Entities argue that the affidavits of Dave "Bo" Finley and Tim Messinger that Union Pacific filed in support of its motion are "impermissibly late and should be stricken" because the dispositive motion deadline expired on September 9, 2016. [Doc. No. 389, p.1]. Alternatively, if the Court were to consider the affidavits, the Taylor Entities move to stay a ruling on the Second Motion for Partial Summary Judgment on Liability and to grant them leave to conduct additional discovery on the opinions contained in the affidavits.

Union Pacific responds that the affidavits were properly filed in the record under the Court's January 19, 2018 Order. Union Pacific responds further that a stay is not necessary because the issue before the Court is a legal question, and additional discovery will not change the preemptive effect of the ICCTA.

First, in granting leave for Union Pacific to file a Second Motion for Partial Summary Judgment on Liability, the Court intended to allow it to support that motion with appropriate evidence. Union Pacific has done so, and the Court will not strike its supporting affidavits as untimely. Second, having fully reviewed the memoranda in support of and in opposition to the

Second Motion for Summary Judgment on Liability and the applicable case law, the Court agrees with Union Pacific that the issue before it is legal, not factual.[4] *See Franks Inv. Co. LLC v. Union Pac. R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010) ("The preemptive effect of a federal statute is a question of law."). Therefore, for the reasons set forth more fully below, the Court finds that neither a stay nor additional discovery is necessary. Accordingly, the Taylor Entities' Motion to Strike [Doc. No. 389] is DENIED.

### B. Second Motion for Partial Summary Judgment

#### 1. Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense[5]--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or

---

[4]To be sure, in an as-applied or implied preemption challenge, the Court must engage in "a fact-bound case-specific determination." *Franks*, 593 F.3d at 413. However, for the reasons set forth below, even viewing those facts in the light most favorable to the Taylor Entities, the Court finds that Union Pacific is entitled to summary judgment under the ICCTA.

[5]The Court has previously determined that federal preemption applies whether the asserting party is raising it as a claim or defense. [Doc. Nos. 343 & 358]. The Court will not address this argument again.

nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248).

### 2. ICCTA

Union Pacific moves the Court for summary judgment on liability, arguing that the Taylor Entities are preempted under the ICCTA from raising the affirmative defense of comparative negligence based on Union Pacific's alleged failure to maintain the Crossing.

The Supremacy Clause to the United States Constitution provides that the Laws of the United States . . . shall be the supreme Law of the Land. U.S. Const., ART. VI, CL.2. Congress has the power under the Supremacy Clause to preempt state law. Preemption may be express or implied. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).

> In determining the nature and reach of federal preemption, Congress's intent is the "ultimate touchstone." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Congress can indicate its preemptive intent either expressly through a statute's plain language, or impliedly through a statute's

8

> "structure and purpose*.*" *Altria Group, Inc. v. Good*, 555 U.S. 70, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008). Regardless of how Congress indicates its intent, we begin "with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (internal quotation marks and citation omitted); *Franks*, 593 F.3d at 407. This assumption applies with "particular force" when Congress legislates in a field traditionally occupied by state law. *Altria*, 129 S.Ct. at 543. On the other hand, the assumption applies with less force when Congress legislates in a field with "a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000). "Historically, federal regulation of railroads has been extensive...." *Fayard v. Ne. Vehicle Servs., LLC*, 533 F.3d 42, 46 (1st Cir.2008).

*Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 803–04 (5th Cir. 2011).

The ICCTA establishes that the Surface Transportation Board (STB") has exclusive jurisdiction over the following:

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance **of** spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).

"Because the relevant statute contains a preemption clause, statutory construction analysis begins with 'the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Franks*, 593 F.3d at 408 (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). Analyzing that language, the Fifth Circuit has concluded that "[t]he text of Section 10501(b), with its emphasis on the word regulation, establishes that only laws that have the effect of managing or governing rail transportation will be expressly preempted," not

9

those having only an "incidental effect." *Id.* at 410 (internal quotation marks and citations omitted). Likewise, "[t]o the extent remedies are provided under laws that have the effect of regulating rail transportation," they are also preempted. *Id.*

Even if not expressly or facially preempted under the ICCTA, a state law claim or defense may be barred by implied preemption. In that regard, the Fifth Circuit has adopted the test used by the STB: "For state or local actions that are not facially preempted, the section 10501(b) preemption analysis requires a **factual assessment** of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation." *Id.* at 413 (quoting *CSX Transportation, Inc.-Petition for Declaratory Order*, STB Finance Docket No. 34662, 2005 WL 1024490, at *2*3 (S.T.B. May 3, 2005)) (internal quotation marks omitted) (emphasis added).

In *Franks*, the Fifth Circuit examined ICCTA preemption in the context of a typical private crossing dispute where a landowner claims a right to cross over the railroad tracks. First, the Franks Court considered whether the claim was expressly preempted. While "[r]esolving the typical dispute regarding rail crossings is not the nature of regulation governed by the exclusive jurisdiction of the STB," a reviewing court must consider whether the specific railroad crossing dispute at issue in any particular case "invokes **laws** that have the effect of managing or governing, and not merely incidentally affecting, rail transportation." 593 F.3d at 411 (emphasis added). In other words, is the interference with "railroad operations" "substantial" or it is merely a "routine crossing dispute"? *Id.* at 413. "For a state court action to be expressly preempted under the ICCTA, it must seek to regulate the operations of rail transportation." *Id.* As the possessory action in *Franks* "invoke[d] only state property laws," the Fifth Circuit found that the action was "not expressly preempted." *Id.*

The Fifth Circuit then turned to an examination of Franks' possessory action under the adopted STB test. The Fifth Circuit found that the private crossings did not result in "unusual interference with the railroad" based on the facts of the case and declined to find implied preemption. *Id.* at 415.

Since *Franks*, the Fifth Circuit has provided further guidance on ICCTA preemption. In *Elam v. Kansas City Southern Ry. Co.*, F.3d 796 (5th Cir. 2011), Barbara Elam suffered injuries when she drove her vehicle into the side of a train while it was stopped on the tracks during switching operations. Mrs. Elam and her husband brought suit against the train's owner and its engineer in Mississippi state court, asserting claims of negligence *per se* under the state anti-blocking statute and simple negligence. The defendants removed the case to federal court, where the district court held that the ICCTA expressly preempted their negligence *per se* claim and impliedly preempted their simple negligence claim. On appeal, the Fifth Circuit affirmed the finding that the negligence *per se* claim was expressly preempted, but found that the simple negligence claim was not expressly preempted and that defendants had failed to meet their factual burden to support the finding of implied preemption on the record at the time.[6]

In that ruling, the Fifth Circuit explained further that § 10501(b) of the ICCTA "does not expressly preempt generally applicable state laws that have a mere 'remote or incidental effect on rail transportation.'" 635 F.3d at 805 (quoting *Franks*, 593 F.3d at 410). Only those state law tort actions that "'fall squarely' under § 10501(b)" by attempting "to manage or govern rail transportation in the economic realm" are expressly preempted. *Id.* at 806-07 (*quoting PCI*

---

[6]The Fifth Circuit considered only whether the district court had jurisdiction under the ICCTA, so the factual record was not fully developed.

*Transp. Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 540 (5th Cir. 2005)).

The Fifth Circuit reiterated that a state law not expressly preempted by the ICCTA "may be impliedly preempted if, as applied to a particular case, it has 'the effect of unreasonably burdening or interfering with rail transportation.'" *Id.* (quoting *Franks*, 593 F.3d at 414). The *Elam* Court emphasized that "economic regulation is at the core of ICCTA preemption," although its preemptive effect is not limited to economic regulation. *Id.* at 806.

The *Elam* Court then applied the law to the facts of the case and found that the Elams' attempted enforcement of Mississippi's anti-blocking statute, regardless of the Elams' purpose, had the effect of economically regulating the railroad's switching operations and thus was expressly preempted. That law, which imposed fines for a railroad's failure to uncouple its cars that obstructed travel on highways after a period of five minutes, had "no application except with respect to the operation of railroads at rail crossings." *Id.* at 807.

However, the Court did not reach the same conclusion with regard to the Elams' simple negligence claim that the railroad failed to provide adequate warnings of the train's presence at the particular crossing. The *Elam* Court explained that "[a] typical negligence claim seeking damages for a typical crossing accident . . . does not directly attempt to manage or govern a railroad's decisions in the economic realm. Like state property laws and rules of civil procedure that generally 'have nothing to do with railroad crossings,' the effects of state negligence law on rail operations are merely incidental." *Id.* at 813 (quoting *Franks*, 593 F.3d at 411). The burden was then on the railroad to demonstrate that providing such warnings would "unreasonably burden or interfere with its switching operations." *Id.* at 814. The railroad's evidence did not suffice when it did not address how providing warnings would "*unreasonably* burden or interfere with [the

railroad's] operations." *Id.* Without such evidence, the Fifth Circuit could only "presume that Congress did not intend to preempt this" kind of typical crossing dispute. *Id.*

Applying these principles to the facts herein, the Court finds that the Taylor Entities' comparative negligence defense is not expressly preempted. The Taylor Entities seek to invoke general negligence law principles to demonstrate Union Pacific's comparative fault in this matter. The Court cannot say that this generally applicable state law falls squarely under § 10501(b) by attempting to manage or govern rail transportation in the economic realm.[7] Therefore, Union Pacific's Second Motion for Partial Summary Judgment on Liability based on a theory of express preemption under the ICCTA is DENIED.

The Court must also consider, however, if the state negligence law, as applied, is preempted under the ICCTA.[8] The Court finds that it is. In this case, the Taylor Entities contend that Union Pacific was negligent in "constructing, repairing, or maintaining the Crossing." [Doc. No 363, p. 22]. Specifically, they argue that the Crossing has been raised over the years, and Union Pacific has failed to repair it. If the Taylor Entities are correct, then Union Pacific would be required to make changes to the Crossing that would require considerable reconstruction.

Union Pacific has presented evidence through the affidavits of David "Bo" Finley and

---

[7]Union Pacific has made a strong argument for express preemption based on the particular negligence claim made in this case because such a claim does indeed appear to have the effect of managing rail transportation. The Court also recognizes that it is possible that the Fifth Circuit might well determine that the Taylor Entities' defense is expressly preempted under these facts. However, under the *Elam* precedent, the Court finds that the Fifth Circuit's directive does not permit a finding of express preemption on a general negligence claim at this time.

[8]Although Union Pacific's main argument is that the Taylor Entities' comparative negligence defense is expressly preempted, the parties have also addressed conflict or implied preemption, and the Court finds it fair to address that analysis as well.

13

Jeffrey Messinger which are sufficient to support a finding that the negligence law, if applied as the Taylor Entities contend, would have the effect of unreasonably burdening or interfering with rail transportation. Finley, the former Director of Track Maintenance for Union Pacific, avers that the Taylor Entities' contentions would require reconstruction not only to change the elevation of the Crossing, but redesign for ¾ mile on both sides of the Crossing. With regard to this project, Finley avers, in pertinent part, that the following would be required:

a) Extensive studies and redesign work that would include drainage/hydrology, land surface/subsurface, topography, signals, signal circuits, fiber optic cable, traffic engineering, nearby crossing/rail switches, and other nearby structures such as drainage culverts among other things.

b) If the . . . studies confirm that lowering the track is feasible, possible, and safe, the project would include extensive construction work that would include not only the railroad track that runs directly through the crossing but also the track for a considerable distance in both directions to satisfy the Federal Railroad Administration's (FRA) Track Safety Standards run-off requirements. . ..

c) . . . [T]he work would require closure of Union Pacific's mainline railroad track through the area along with multiple highway/roadway crossings for 3 to 4 days if not more.

d) . . . [A]t least five road crossings would be impacted and closed to perform the work. Additionally, the three switches would be impacted and at least one switch would require major rehabilitation. The signal cable from mile post 473.2 to 473.7 would likely have to be replaced. There is fiber optic cable that would be affected and would

> require coordination with the fiber optic company and possible relocation. Additionally, there is a 4 x 3 foot box culvert at mile post 473.58 that would be impacted and possibly moved or replaced depending on the drainage/hydrology study and the potential impact on the railroad and community. Also impacted would be approximately ¼ mile of adjacent tracks 403 and 754 . . .
>
> e) This project would require coordination with the Louisiana Department of Transportation and Development to close the highway that intersects with the . . . track . . . to allow for completion of the work. . .
>
> f) If this stretch of track were closed for 3 or 4 days, . . . Shipments would have to be rerouted and trains would have to be rescheduled . . .
>
> g) Coordination with the Louisiana Department of Transportation and Development to redesign and reconstruct the roadway approaches to the crossing after the track is lowered.
>
> h) . . . The current height of the track protects against water pooling on or around the tracks. Conversely, lowering the track to the level sought . . . would create a greater risk of flood water entering into the crushed stones (known as ballast) on top of the embankment or flowing over the tracks—both of which create a dangerous condition for train operations.

[Doc. No. 380-1, Finley Aff.]. Finley points out that, on average, nine trains travel this line per day in the corridor running between Alexandria, Louisiana, and Little Rock, Arkansas. *Id.* He anticipates construction costs of approximately $2,000,000. *Id.* Messinger, a land surveyor, avers that he surveyed the Crossing, including the elevation of

the tracks, in January 2015. [Doc. No. 380-3, Messinger Aff.]. He further avers that part of the town of Mer Rouge lies in a 100 year flood zone and that the Union Pacific "tracks that run through the town . . . are built to exceed the 100 year flood zone . . . as of January 2015." *Id.*

The Taylor Entities dispute whether the reconstruction project creates an unreasonable burden on Union Pacific's railroad operations, relying on an affidavit from their expert, Alan Blackwell, as well as whether the Crossing is in a 100 year flood zone or would be in such zone if the project discussed by Finley were completed. [Doc. No. 386-1, Blackwell Aff.]. Blackwell, a former track inspector for Union Pacific, disputes Finley's analysis and contends that this would be "rehabilitation," not reconstruction, that Finley's "estimates are a gross exaggeration," and that it would be a "standard road crossing rehabilitation project[ ]." *Id.* at ¶¶ 13, 15, & 19.

However, as Union Pacific points out, Blackwell does not deny that the Taylor Entities' comparative negligence defense "concerns the design of the railroad tracks and crossing" or that "considerable redesign and reconstruction work"[9] is required; he "simply disagrees with Union Pacific's evidence on the magnitude of the work." [Doc. No. 397, p. 6].

This Court finds that a fairly recent decision of the STB, which was affirmed by the United States Court of Appeals for the Eighth Circuit, is factually similar to the present case and is persuasive, particularly given the Fifth Circuit's adoption of the STB's implied preemption test. *See Thomas Tubbs v. Surface Transportation Board*, 812 F.3d 1141, 1146 (8th Cir. 2015). In that case, part of the railroad's track sat atop an embankment which served as a dam for occasional floodwaters from the Missouri River. Although the railroad raised its embankment and

---

[9]Blackwell would call this work "rehabilitation," of course, but he does not deny that work is necessary.

16

accompanying mainline track and fortified the entire track with rock, rip-rap, and other materials, flood waters breached the embankment and flooded the plaintiffs' farm. They filed suit in state court alleging trespass, nuisance, negligence, inverse condemnation, and statutory trespass under state law. The state court stayed the case to allow the plaintiffs to seek a ruling from the STB. On review, the STB found that whether the claims were considered under the categorical (express)[10] or as applied (implied) preemption tests, they were preempted "because they have the effect of regulating and interfering with rail transportation." *Thomas Tubbs—Petition for Declaratory Order*, Docket No. FD 35792, 2014 WL 5508153, at *4 (Oct. 31, 2014). Further, "if allowed to proceed," the plaintiffs' claims "would unduly burden interstate commerce and amount to impermissible state regulation of [the railroad's] operations by interfering with the railroad's ability to uniformly design, construct, maintain, and repair its railroad line. The interstate rail network could not function properly if states and localities could impose their own potentially differing standards for these important activities, which are an integral part of and directly affect, rail transportation." *Id.* at *5.

Likewise, in this case, the Taylor Entities "seek to manage or govern railroad operations" and "allowing them to go forward" with their comparative negligence defense "would unreasonably interfere with rail transportation." *Id.* The Court finds that the Taylor Entities' comparative negligence defense based on Union Pacific's construction, repair, or maintenance of the Crossing is preempted under the ICCTA.

III. CONCLUSION

---

[10] For the reasons previously stated, the Court does not adopt the STB's analysis on express preemption.

For the reasons set forth above, the Taylor Entities' Motion to Strike is DENIED, and Union Pacific's Second Motion for Partial Summary Judgment on Liability is GRANTED IN PART AND DENIED IN PART. To the extent that Union Pacific moves for summary judgment based on a theory of express preemption under the ICCTA, the motion is DENIED. To the extent that Union Pacific moves for summary judgment based on a theory of implied preemption under the ICCTA, the motion is GRANTED, and the Taylor Entities are foreclosed from raising the affirmative defense of comparative negligence at trial.

MONROE, LOUISIANA, this 10th day of April, 2018.

_____
TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE